RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2003 FED App. 0143P (6th Cir.)
File Name: 03a0143p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

MT. CLEMENS GENERAL
HOSPITAL,
            *Petitioner/*
*Cross-Respondent,*

            Nos. 01-2263/2525

            *v.*

NATIONAL LABOR RELATIONS
BOARD,
            *Respondent/*
*Cross-Petitioner,*

LOCAL 40, OFFICE AND
PROFESSIONAL EMPLOYEES
INTERNATIONAL UNION,
AFL-CIO,
            *Intervenor.*

On Petition for Review and Cross-Application
for Enforcement of an
Order of the National Labor Relations Board.
Nos. 7-CA-42498(1)(2); 7-CA-42690; 7-CA-43149.

Submitted: April 29, 2003

Decided and Filed: May 15, 2003

---

Before: MOORE and ROGERS, Circuit Judges; KATZ,
District Judge.[*]

---

**COUNSEL**

**ON BRIEF:** John P. Hancock, Jr., Michael F. Smith,
BUTZEL LONG, Detroit, Michigan, for Petitioner. Aileen A.
Armstrong, Kira Vol, Meredith L. Jason, NATIONAL
LABOR RELATIONS BOARD, Washington, D.C., for
Respondent. Scott A. Brooks, GREGORY, MOORE,
JEAKLE, HEINEN & BROOKS, Detroit, Michigan, for
Intervenor.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge. Petitioner Mt.
Clemens General Hospital ("Hospital") seeks review of the
National Labor Relations Board's ("NLRB" or "Board")
decision that the Hospital's prohibition of "No F.O.T."
buttons constituted an unfair labor practice in violation of the
National Labor Relations Act ("Act"). The NLRB and, as an
intervenor, the Union responsible for distributing the buttons
seek enforcement of the NLRB's decision and order.

The Union distributed "No F.O.T." buttons to registered
nurses ("RNs") at the Hospital in support of its opposition to
"forced overtime." Soon after the buttons were distributed,
the Hospital confiscated them. The Union grieved the
Hospital's decision, and an administrative law judge ("ALJ")
concluded that the prohibition was an unfair labor practice in
violation of the Act. On review, the NLRB affirmed the

---

[*] The Honorable David A. Katz, United States District Judge for the
Northern District of Ohio, sitting by designation.

ALJ's decision. The Hospital filed a petition for review of the Board's decision and order and the Board filed a cross-application for enforcement of its order. Because substantial evidence supports the Board's conclusion that the Hospital improperly prohibited the "No F.O.T." buttons, we **DENY** the Hospital's petition for review and grant the NLRB's cross-application to **ENFORCE** its order.

## I. FACTS AND PROCEDURE

Mt. Clemens General Hospital provides in-patient and out-patient medical care in Mt. Clemens, Michigan. The Hospital's registered nurses are represented by the RN Staff Council, Office and Professional Employees International Union, Local 40, AFL-CIO ("Union").

Between February 1998 and February 2001, the Union's relationship with the Hospital was governed by a collective bargaining agreement ("CBA"). The parties supplemented this agreement in December 1998 with a Letter of Understanding ("Letter") addressing RN staffing issues.

The Letter permitted the Hospital to require nurses to work overtime where "patient safety" is involved. Joint Appendix ("J.A.") at 98 (Letter). It further provided that the Hospital would pay bargaining unit members a double-time scheduling premium for overtime. During the double-time regime, the Hospital employed very little forced overtime because RNs volunteered for enough extra hours to meet the Hospital's staffing needs.

When the double-time premium expired, the Union unsuccessfully tried to negotiate an extension. The Union filed a grievance with respect to the issue but did not arbitrate the matter when the grievance was rejected in November 1999. With the expiration of the double-time premium, the Hospital began to rely on forced overtime to staff its units. Some Hospital employees attempted to avoid forced overtime, and two were allegedly fired for submitting falsified medical documents stating that they could not work overtime.

The Union also grieved the termination of these employees, but the terminations were upheld in arbitration. Debate about forced overtime continued.

In October 1999, Union President, RN Vickie Kasper ("Kasper"), received a complaint from an RN who was required to work mandatory overtime. On October 4, 1999, Kasper wrote a memorandum to the RNs updating them on the most recent forced overtime dispute with the Hospital. She advised them,

> Talking is not working. The traditional grievance process needs your additional support of showing management how united we are. This is YOUR chance to quietly show management your support of your fellow nurse by giving a VISUAL AID to your support. You need not explain anything to anyone. Your officers will inform management of this action. Consider this another way of showing your professional, proactive support of your Union in the effort to improve EVERY nurse's work environment. We need to STOP THIS NOW. This community and this body of nurses need your SUPPORT NOW.

J.A. at 104 (Kasper Mem.). Kasper explained that she did not want individual RNs to debate the forced overtime issue with their supervisors or to discuss it with their patients and the patients' families.

Kasper had "No F.O.T." buttons made. The buttons depict a red "universal no" symbol, a circle bisected by a diagonal slash, over black letters spelling "F.O.T." However, nothing on the buttons indicates that they have anything to do with the Union, or Union-management issues.[1] The Union distributed

---

[1] The Hospital maintains that "the obvious aim of the cryptic button was to elicit questions from patients, family members and others in the hospital, thereby drawing them into the labor-management dispute, and taking the nurse's time and attention away from his or her job." Hospital

the buttons as early as October 8, 1999, and RNs wore them throughout the Hospital. In the Intensive Care Unit, sixty to eighty buttons were distributed in the RNs' mailboxes in the staff lounge.

Ten minutes after they learned of the buttons, Priscilla Horde ("Horde"), the Hospital's Director of Employee Relations, and David Klinger ("Klinger"), the Hospital's Vice President of Human Resources, issued a directive banning them. Horde maintains that she was concerned that the ambiguous message of the buttons would prompt patients to ask questions and thus promote discussion of forced overtime between RNs and patients. She concluded that wearing the "No F.O.T." button violated the following provision of the parties' collective bargaining agreement:

> The Union recognizes that procedures have been provided in this Agreement for the equitable settlement of grievances. Therefore, the Union and its members agree that neither will call, engage in, participate in, or sanction any strike, sympathy strike, stoppage of work, picketing of the Hospital, sit-down, sit-in, boycott or interfere with the conduct of the Hospital's service for any reason whatsoever nor engage in any other activities that may disturb or interfere with the welfare of patients or operations of the Hospital.

J.A. at 56 (CBA Art. 8, § 2). Section one of the same Article explains that "nothing should interfere" with the Hospital's provision of "continuous service to the public in providing proper treatment and nursing care for patients." J.A. at 56 (CBA Art. 8, § 1).

---

Br. at 8. Kasper concedes that the Union's intent in wearing the buttons in patient-care units was in part to have patients see the buttons. *See* J.A. at 36 (Kasper E-mail) ("If this hospital is so intimidated by the public knowing that they are forcing nurses to work forced overtime against their will, they should be ready for this to be staring them in the face, in the Newspaper.").

The Hospital had permitted nurses to wear buttons on previous occasions without confiscating or banning them, including buttons that denoted Union activity or expressed Union-related themes.[2] However, Horde instructed supervisors to require the RNs to remove the "No F.O.T." buttons from their uniforms. Clinical Manager Kevin McLaughlin took the buttons from the RNs' mailboxes in the ICU nurses' lounge. The Hospital never told the RNs that the "No F.O.T." button was barred only from patient-care areas or clarified where the RNs were permitted to wear the button. Moreover, the Hospital never returned the confiscated buttons.

When Kasper learned that the "No F.O.T." buttons had been confiscated, she sent electronic mail to several individuals, warning that the Union would bring the issue to public attention through newspapers and bumper stickers. Kasper called Hospital management "idiots" and "fascist pigs," and warned that she was willing to "die on this hill" for the issue. J.A. at 36 (Kasper E-mail). The Hospital claims that this was a "thinly veiled threat to respond to the button confiscation with acts of physical violence." Hospital Br. at 15.

The Union never grieved the Hospital's decision to ban the buttons, as was permitted under Article 8, Section 2 of the CBA. Moreover, the Union never asked the Hospital why it

---

[2]RNs are required to wear identification badges when they are on duty and often attach personal buttons to their identification badges or their uniforms. *See* J.A. at 269 (ALJ Hr'g Stip. of Hosp. Atty.) ("[W]e can stipulate that we have never, the Hospital, taken any other seasonal decorations, sports emblem or any other Union button off of any of our employees other than the FOT."). The Union had distributed several buttons in the past, displaying slogans such as "Living Wage = Family Value," "PRO RN, PRO PATIENT, PRO UNION," "A Victory for One is a Victory for All," and "THE TEAM CONCEPT: Workers and Management Pulling Together." J.A. at 100 (Buttons). The "team concept" button depicts management and employees working together to saw off a tree limb upon which the employees are sitting.

told employees to remove the "No F.O.T." buttons, and the Union never raised the issue during its monthly meetings with management. The Hospital maintains that it confiscated the buttons because it viewed them as a form of work stoppage and feared that the buttons would disrupt the provision of patient care.

The Union filed a complaint with the NLRB alleging that the Hospital had committed five unfair labor practices in violation of the National Labor Relations Act. The Hospital allegedly (1) discriminatorily required members of the Union's bargaining unit to remove Union insignia from their uniforms, confiscated the insignia, and enforced an overly-broad insignia policy; (2) failed to respond to the Union's June 4, 1999, request for information for "RN Staff Council Local 40 Registration forms," J.A. at 123 (ALJ Dec.); (3) failed to respond to the Union's May 2, 2000, request for information concerning the Hospital's use of "agency nurses," independent contractors provided by outside agencies; (4) unlawfully bypassed the Union and dealt directly with bargaining unit employees; and (5) unlawfully bypassed the Union by surveying employees about staffing and overtime issues.

Following a trial, an ALJ found that the Hospital violated the Act with respect to the confiscation of "No F.O.T." buttons and the May 2000 request for information regarding agency nurses. The ALJ dismissed the Union's three remaining charges.

The Hospital filed timely exceptions to the rulings, findings, and conclusions of the ALJ with respect to the confiscation of the buttons.[3] On review, a three-member panel of the Board affirmed the ALJ's conclusion that the

---

[3]The Hospital did not file exceptions to the ALJ's findings about the May 2000 information request.

Hospital's actions violated the Act, but modified his decision with respect to two evidentiary findings.[4]

The Board issued an order requiring the Hospital to post a notice to employees stating that, among other things,

> WE WILL NOT discriminatorily require employees to remove union insignia or buttons from their uniforms or confiscate the insignia.

> WE WILL NOT maintain an overly broad policy concerning the wearing of union buttons.

> ***

> WE WILL NOT in any like or related manner, interfere with, restrain, or coerce you in the exercise of the rights guaranteed you by Section 7 of the Act.

J.A. at 138 (NLRB Dec. & Order).

---

[4]The NLRB commented on the ALJ's factual findings as follows: We note that the judge has in one instance misstated the testimony of registered nurse Marion Beaufait. Both the Respondent and the General Counsel agree that Beaufait testified that Clinical Manager McLaughlin directed her to remove the overtime protest button from her uniform and confiscated it as she stood at the nurses' station on October 8, 1999. The judge erroneously stated that this incident took place in the nurses' lounge. We find that this error has no effect on the judge's conclusion that the Respondent violated Sec. 8(a)(1) by enforcing an overly broad policy concerning the wearing of buttons. In adopting this finding that the prohibition against wearing protest buttons in patient care areas was unlawful, we find no need to rely on the judge's observation that the Respondent's Vice-President Michael Tonie never put in writing his reasons for speculating that the wearing of the protest button in patient care areas of the hospital could cause possible disruptions.
J.A. at 132 (NLRB Dec. & Order n.1).

The Hospital filed a petition for review of the Board's decision and order, and the Board filed a cross-application for enforcement. We subsequently granted the Union's motion to intervene.

## II.  THE INFORMATION REQUEST

In its petition for review, the Hospital asks us to set aside the portion of the NLRB's order finding that the Hospital's "actions with regard to the provision of information in response to the Union's requests" violated Sections 8(a)(1) and (5) of the Act.  J.A. at 140 (Pet. for Review).  The Hospital did not file exceptions to the ALJ's findings on this matter when seeking Board review. Pursuant to Section 10(e) of the Act, 29 U.S.C. § 160(e), "[n]o objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."  Because the Hospital "did not make a timely challenge to the Board's findings" with respect to this issue and has not made a showing of extraordinary circumstances, the Board's resolution of the information request issue is "entitled to summary enforcement." *NLRB v. Tri-State Warehouse & Distrib., Inc.*, 677 F.2d 31, 32 (6th Cir. 1982).

## III.  THE "NO F.O.T." BUTTONS

Section 7 of the National Labor Relations Act gives employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."  29 U.S.C. § 157.  Section 8(a)(1) of the Act makes it "an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [Section 7]."  29 U.S.C. § 158(a)(1).  In this case, the Board and the ALJ concluded that the Hospital violated Section 8(a)(1) "by

discriminatorily requiring employees to remove union insignia from their uniforms, confiscating the insignia and enforcing an overly broad policy concerning such activity."  J.A. at 128 (ALJ Dec.).  Therefore, in reviewing the NLRB's determination, we must consider both whether the Union members were engaged in protected Section 7 activity and whether the Hospital violated Section 8(a)(1) by infringing on that activity.  "The General Counsel of the NLRB bears the burden of proof in unfair labor practices cases." *NLRB v. Fluor Daniel, Inc.*, 161 F.3d 953, 965 (6th Cir. 1998).

### A.  Standard of Review

The Board's findings of fact are conclusive if they are supported by substantial record evidence. 29 U.S.C. § 160(e); *see NLRB v. Main St. Terrace Care Ctr.*, 218 F.3d 531, 537 (6th Cir. 2000).  We have concluded that there is substantial evidence for a Board decision where there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," even if there is also substantial evidence for an inconsistent conclusion.  *Id.* (quotation omitted).  Moreover, even if we would conclude differently under de novo review, we "defer to the Board's reasonable inferences and credibility determinations."[5] *Painting Co. v. NLRB*, 298 F.3d 492, 499 (6th Cir. 2002); *see NLRB v. Taylor Mach. Prods., Inc.*, 136 F.3d 507, 514 (6th Cir. 1998) ("We afford even more deference to Board determinations of credibility and will not normally set aside the Board's choice between conflicting testimony.").  Moreover, we defer to the Board's application of law to the facts if it is supported by substantial evidence.  *Main St.*, 218 F.3d at 537.

Our review of the Board's interpretations of the Act is deferential.  As long as Congress has not spoken directly "to the precise question at issue," *Chevron, USA, Inc. v. Natural*

---

[5]Therefore, it would be inappropriate for us to consider the Hospital's arguments that Vickie Kasper and RN Michael Schultz were not credible witnesses.  *See* Hospital Br. at 16-17, 29-30.

*Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984), we review the Board's decision solely to assess whether it "is based on a permissible construction of the statute," *NLRB v. Webcor Packaging, Inc.*, 118 F.3d 1115, 1119 (6th Cir. 1997) (quotation omitted). Thus, as long as the Board's interpretation is "reasonably defensible," we will not disturb its reading of the statute. *Meijer, Inc. v. NLRB*, 130 F.3d 1209, 1212 (6th Cir. 1997) (quotation omitted). However, we review all other questions of law de novo. *Id.*

## B. Protected Activity

"It is well established that employees have a protected right to wear union insignia at work in the absence of 'special circumstances.'" *Holladay Park Hosp.*, 262 N.L.R.B. 278, 279 (1982). Where employees wear pins or stickers "in an effort to encourage their coworkers to support the Union's" position on a matter,[6] it "constitute[s] protected, concerted activity." *St. Luke's Hosp.*, 314 N.L.R.B. 434, 435 (1994).

In this case, there is substantial evidence in the record to support the Board's conclusion that the buttons "represent[ed] a silent protest of 'no forced overtime,'" and that the nurses' wearing of the buttons was protected activity. J.A. at 134 (NLRB Dec. & Order). Although nothing on the "No F.O.T." buttons themselves indicates that they have anything to do with the Union or disputes between the Union and Hospital management, the Hospital understood immediately that the

---

[6]The Hospital suggests that the "No F.O.T." buttons were not protected because the Union was not engaged in contemporaneous negotiations with management about forced overtime when the Union distributed the buttons. *Cf. St. Luke's Hosp.*, 314 N.L.R.B. 434, 434 (1994). Even so, the buttons do demonstrate support for the Union's position that the Hospital should not employ forced overtime to resolve staffing shortages. The Union did not forfeit its Section 7 right to protest the Hospital's use of forced overtime when it signed a CBA permitting forced overtime because the Union did not clearly and unmistakably waive its right to contest the term. *NLRB v. Mead Corp.*, 73 F.3d 74, 79 (6th Cir. 1996).

buttons communicated a message from the Union. *See* NLRB Br. at 18 ("[I]t is undisputed that the no-F.O.T. button expresses the RNs' dissatisfaction with the Hospital's use of forced overtime."). When Horde and Klinger decided to ban the buttons, Horde even "call[ed] the Union to advise the Union" of the decision. J.A. at 296-97 (Horde Test.). Thus, there is substantial evidence on the record to demonstrate that the buttons were Union insignia, protected under Section 7. The Hospital's brief assumes that wearing the "No F.O.T." button was a Union activity, emphasizing only that the activity was not a *silent* protest.

We therefore must consider whether substantial evidence supports the NLRB's conclusion that the wearing of "No F.O.T." buttons did not result in a loss of Section 7 protections. Employees can lose Section 7 protections if they engage in concerted activity that violates a contractual no-strike provision. *NLRB v. City Disposal Sys. Inc.*, 465 U.S. 822, 837 (1984). Moreover, Section 7 does not protect concerted attempts by employees to exert economic pressure on their employer and force the employer to capitulate to their demands, regardless of whether they involve a partial strike, slowdown, or intermittent work stoppage. *NLRB v. Blades Mfg. Corp.*, 344 F.2d 998, 1004-05 (8th Cir. 1965); *Elk Lumber Co.*, 91 N.L.R.B. 333, 337 (1950); *Phelps Dodge Copper Prods. Corp.* 101 N.L.R.B. 360, 368 (1952).

The Hospital argues that the employees "donn[ed] the 'No F.O.T.' buttons in a deliberate attempt to conduct a series of intermittent strikes, during which they would be foregoing their work while they proselytize patients, family members and other members of the general public with their opposition to mandatory overtime." Hospital Br. at 21. The Hospital points to record evidence that arguably shows that one of the Union's known objectives in wearing "cryptic" buttons was to elicit questions about the meaning of the buttons from patients. However, our role is not to consider whether substantial evidence in the record supports the Hospital's interpretation of the button-wearing as unprotected activity

under Section 7, but rather to determine whether substantial evidence supports the NLRB's conclusion that this was protected activity.

We conclude that substantial evidence supports the NLRB's conclusion that the Union's activity did not merit the loss of Section 7 protections. The record contains no evidence suggesting that by wearing the "No F.O.T." buttons, the RNs engaged in a partial strike, slowdown, or even intermittent work stoppage. As Kasper's memorandum to the RNs explains, the buttons were intended as a quiet show of support, not a means of disrupting workplace productivity. Even assuming that the Union's intent was to promote dialogue about the forced overtime issue, there is no evidence that achieving such a result would interfere with the RNs' job performance.[7] The Union's distribution of potentially controversial buttons in the past had caused no such disruptions. More importantly, no existing law suggests that wearing a button to protest a term of employment constitutes a slowdown or intermittent stoppage.[8] Thus, we conclude that substantial evidence supports the NLRB's conclusion that the Union members did not engage in a concerted effort to

---

[7]The Hospital suggests that evidence of the Union's intent to publicize its opposition to forced overtime is tantamount to a finding that the Union sought to exert economic pressure on the Hospital. Regardless of how many RNs testified that they intended people to see the "No F.O.T." button, however, the law does not equate a Union's intent to publicize an issue to a work stoppage or slowdown.

[8]*See Vista Hill Found.*, 280 N.L.R.B. 298, 299 (1986) ("In contrast to the presumptive validity of rules proscribing verbal solicitation of working employees, the Board and the courts have long recognized that employees have the right to wear union insignia even while at work."); *see also George J. London Mem'l Hosp.*, 238 N.L.R.B. 704, 708 (1978).

  The Hospital points to two previous incidents as evidence that the "No F.O.T." buttons might disrupt hospital operations — two RNs were fired for submitting medical documents that said they could not work overtime. There is no evidence, however, that the buttons were likely to cause additional disruptions of this nature.

exert economic pressure on their employer and force it to capitulate to their demands. *Blades Mfg. Co.*, 344 F.2d at 1005.

Therefore, substantial evidence supports the Board's decision that wearing the "No F.O.T." buttons was protected Section 7 activity.

## C. Unfair Labor Practice

To determine "whether an employer has violated section 8(a)(1)," we consider "whether the employer's conduct tends to be coercive or tends to interfere with the employees' exercise of their rights." *V & S ProGalv, Inc. v. NLRB*, 168 F.3d 270, 275 (6th Cir. 1999) (quotations omitted). In the healthcare context, the Supreme Court has permitted the Board to distinguish between patient-care and non-patient-care areas when evaluating a potentially unfair labor practice. *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 506-507 (1978). Restrictions on the wearing of union-related buttons are presumptively valid in patient-care areas, while restrictions on the wearing of union-related buttons in non-patient care areas are presumptively invalid in the absence of special circumstances. *Casa San Miguel, Inc.*, 320 N.L.R.B. 534, 540 (1995); *see NLRB v. Baptist Hosp., Inc.*, 442 U.S. 773, 781 (1979) (explaining that there is "a ban on the prohibition of solicitation in areas other than immediate patient-care areas 'where the [hospital] has not justified the prohibitions as necessary to avoid disruption of health care operations or disturbance of patients'").

Substantial evidence supports the Board's conclusion that the Hospital prohibited the "No F.O.T." buttons in both patient-care and non-patient care areas. The Hospital argues that it confiscated or sought the removal of the "No F.O.T." buttons only in areas "in the patient care floor," but does not dispute that buttons were confiscated from the RNs in locations where patients would not be, such as nurses' lounges. J.A. at 288 (Horde Test.). The Hospital's Director

of Employee Relations also concedes that, as far as she knows, the Hospital communicated nothing to employees about "where they could wear this button," and never returned the confiscated buttons to the employees.[9] J.A. at 307 (Horde Test.). As a whole, this testimony constitutes substantial evidence supporting the Board's conclusion that the Hospital's ban on the "No F.O.T" buttons extended to all areas of the Hospital, including non-patient care areas.

It is the Hospital's burden to demonstrate the presence of special circumstances that justify its prohibition of Union-related buttons in all areas of the Hospital other than immediate patient-care areas. *NLRB v. Harper-Grace Hosps., Inc.*, 737 F.2d 576, 578 (6th Cir. 1984). To demonstrate special circumstances, the Hospital must show that its prohibition on wearing "No F.O.T." buttons in non-patient care areas "was necessary to avoid disruption of health care operations [or] disturbance of patients." *Id.*; *see Holladay*, 262 N.L.R.B. at 279 ("special circumstances" have been found in the health care context "where the employer was motivated by a genuine concern for the health and welfare of its patients in prohibiting nurses from wearing union insignia at work and there was no evidence of discriminatory enforcement of the employer's longstanding rule against nurses wearing any attachments to their clothing"). According to the Supreme Court, "[s]olicitation may disrupt patient care if it interferes with the health-care activities of doctors, nurses, and staff, even though not conducted in the presence of patients. And solicitation that does not impede the efforts of those charged with the responsibility of caring for patients nonetheless may disturb patients exposed to it." *Baptist Hosp.*, 442 U.S. at 781 n.11.

---

[9]The fact that Kasper was permitted to wear the "No F.O.T." button during Hospital staff meetings does not prove that the Hospital's prohibition of the buttons was limited or that the Hospital informed the RNs that they could retain the "No F.O.T." buttons and wear them in certain areas of the Hospital.

Substantial evidence supports the Board's conclusion that the Hospital failed to demonstrate special circumstances justifying its across-the-board prohibition of the "No F.O.T." buttons. The Hospital's efforts to justify a ban on the "No F.O.T." buttons in non-patient care areas depend primarily on speculation about the possible effect of the buttons. For example, Horde explained the Hospital's fear that patients would be concerned about the quality of care at the Hospital because RNs would explain the button by saying, "you know, I'm not happy, you know, they are forcing me to work overtime." J.A. at 287 (Horde Test.). Dr. Michael Tawney ("Tawney") also expressed concern that the "No F.O.T." button "would raise questions and cause the patient or their family to be concerned that care might not be properly rendered to them or their loved one because of the fact that there seems to be an issue at hand as to whether or not overtime is going to be able to be forced or voluntary." J.A. at 290 (Tawney Test.). According to Tawney, physicians and patients alike would be concerned about the quality of care provided by RNs preoccupied with "some other situation or some other problem" like forced overtime. J.A. at 291 (Tawney Test.).

The Hospital articulates concerns about the "No F.O.T." buttons but fails to offer evidence either that the buttons caused problems or that they were more likely to cause problems than any other Union buttons worn by RNs at the Hospital. Furthermore, the Hospital made no attempt to meet its burden of producing evidence pertaining to each non-patient care area affected by the global prohibition of the "No F.O.T." buttons. *See Vista Hill Found.*, 280 N.L.R.B. 298, 299 (1986) (requiring an employer to "demonstrate an adverse impact on patient care in those areas of the hospital where the ban applies"). Therefore, substantial evidence in the record supports the Board's conclusion that the Hospital failed to meet its burden of demonstrating special circumstances.

In addition to finding that the Hospital failed to show the presence of special circumstances, the NLRB concluded that

the Hospital's prohibition of the "No F.O.T." buttons was invalid even in patient-care areas. According to the NLRB, the Hospital allowed RNs to wear similar buttons while caring for patients. This undercuts the Hospital's contention that wearing the buttons would interfere with patient care. *See George J. London Mem'l Hosp.*, 238 N.L.R.B. 704, 709 (1978) (noting that a hospital's historically sporadic enforcement of rule prohibiting all insignia not of a professional nature discredits the hospital's contention that such insignia critically disrupt patient care).

Although the Hospital does not dispute its longstanding practice of permitting RNs to wear a variety of personal, Hospital, and Union buttons, it maintains that the character of the "No F.O.T." button is singularly disturbing and disruptive. Admittedly the "No F.O.T." button is somewhat cryptic, but that did not necessarily render it more likely to provoke conversation than other buttons. For example, patients would require explanation of the "A Victory for One is a Victory for All" button. Without asking an RN, a patient would not understand the button's message because the patient would not know to what victory the statement referred. Moreover, other Union buttons have been likely to spark conversation, not because their messages are unclear, but rather because their messages are openly contentious. For example, the "team concept" button reflects open hostility between the Union and the Hospital. But, although the "victory" and "team concept" buttons conveyed Union messages that may have been as contentious as that conveyed by the "No F.O.T." button, there is no indication that the earlier buttons interfered with patient care. Thus, substantial evidence supports the NLRB's conclusions that the "No F.O.T." button was not singularly disruptive and that the Hospital's prohibition of the button was invalid even in patient-care areas.

Because substantial evidence supports the Board's finding both that the Union demonstrated the invalidity of the Hospital's prohibition in patient-care areas and that the Hospital failed to justify the prohibition in non-patient care areas, we uphold the Board's conclusion that the Hospital committed an unfair labor practice in violation of Section 8.

## IV. CONCLUSION

For the reasons stated above, we **DENY** the Hospital's petition for review and grant the Board's cross-application to **ENFORCE** its order.